# COURT OF ERRORS AND APPEALS

OF THE

## STATE OF NEW JERSEY,

## ON APPEAL FROM THE COURT OF CHANCERY AND THE PREROGATIVE COURT,

### NOVEMBER TERM, 1896.

---

ELIZABETH MARTLING, appellant,

*v.*

STEPHEN V. R. MARTLING et al., respondents.

DAVID MARTLING, appellant,

*v.*

STEPHEN V. R. MARTLING et al., respondents.

1. A conveyance was made, in 1851, in fee to trustees, declaring the following trusts: "*First.* To permit Elizabeth Martling (now living) to have, receive and enjoy the rents, issues and profits thereof during her natural life, free from the control of her present or any future husband, and to her separate use, subject, however, to the limitations thereinafter mentioned. *Second.* To sell and convey in fee-simple the whole or any part thereof, lease, rent or mortgage

[771]

Martling v. Martling.

the same or any part thereof to such person or persons, for such term or terms, for such sum or sums, and on such conditions as the said Elizabeth, by writing under hand of her own free will may direct. *Third.* In case of a sale and conveyance as aforesaid to invest the net proceeds, after paying said encumbrances, upon good and sufficient security, and pay her, the said Elizabeth, the interest accruing thereon yearly and every year, or to reinvest said net proceeds in the purchase of other real estate, as the said Elizabeth by writing may direct, to be held according to the trusts in the said deed declared. *Fourth.* In further trust, to sell and convey, if necessary, the whole or any part of said premises to pay off, satisfy and discharge the encumbrances now being and existing on the same as aforesaid. *Fifth.* In further trust, upon the death of the said Elizabeth to convey the lands held under the trusts therein declared, or such parts thereof as may then remain, or if the same shall have been sold, to dispose of the proceeds thereof unto such person or persons as the said Elizabeth, by writing in the nature of a last will, executed by her in her lifetime, may have appointed and directed, and in default of such appointment unto her heirs-at-law or next of kin, as may be."

2. The trustees are both dead and the heir of the survivor is an infant. On bill to declare the trust extinguished and to compel conveyance to Elizabeth Martling, who is now a widow—*Held*, (1) The trustees, by force of the conveyance, took a legal estate, the trust not being uses executed by the statute of uses so as to transfer the legal estate to the *cestui que use.* (2) The legal estate being in the trustees, an equitable estate vested in Mrs. Martling. (3) The trust is a continuing trust until completely executed, and the legal estate will remain in the trustees until the trust estate is transferred to the devisees, heirs-at-law or next of kin of Mrs. M., the persons ultimately entitled. (4) The power to sell and convey, coupled with the words directing the trustees to invest &c., and pay interest &c., or reinvest the proceeds in real estate &c., to be held according to the original trust, imports a sale for a consideration—a *bona fide* price. (5) The rule in *Shelley's Case* applies as well to equitable estates as to legal estates, and a limitation which in a legal estate would create a fee will have like effect with respect to an equitable estate. *Cushing* v. *Blake, 3 Stew. Eq. 689.*[*] (6) The rule in *Shelley's Case* is a rule of positive law and not of construction. Where, upon the construction of a grant or devise, the rule is found to be applicable, it cannot be controlled by any expression of a contrary intent. But whenever the rule in *Shelley's Case* is invoked a preliminary question arises, whether the word "heirs" has been used in such a sense as will make the rule applicable. (7) The word "heirs," following an estate of freehold, indicates succession to the estate of the ancestor by his descendants, but it may be a succession by descent creating either an estate in fee or in tail in the ancestor, or the selection of those persons who by the canons of

***

[*] The seventh paragraph of the syllabus in *Cushing* v. *Blake, 3 Stew. Eq. 689,* is misprinted, the word "not," in the first line, having been omitted. The paragraph should read: "A mere direction to convey will *not* convert" &c.— REP.

descent would be heirs as a mere *designatio personarum* of the objects of the grantor's or testator's bounty, in which event the heir or heirs take by purchase. Whether the word " heirs" is used in its technical sense or in the limited, restrictive and untechnical sense, intending to point to such individual person as should be heir or heir of the body of the tenant for life at the moment of his decease, is a matter of construction of the grant or devise by the ordinary rules of interpretation. (8) In applying the rules of construction, the fact that the estate of the ancestor is expressly for life only and no longer, or that he shall not sell or dispose of the estate for any longer time than his life, and like expressions applied to the estate of the tenant for life, will not prevent the application of the rule in *Shelley's Case*. Nor will an unexecuted power, which if executed would divert the estate from the channel of succession indicated by the words of grant or devise, of itself supersede the rule in *Shelley's Case*. (9) The construction to determine the meaning of the testator or donor in using the word "heirs" will be from the language of the entire instrument, and if it appears from it that the grantor or devisor did not use the word "heirs" in its technical sense, but in its popular sense, the word "heirs" will be construed in its untechnical sense as a word of purchase and not of limitation. (10) On a construction from the entire trust contained in the deed in question, the persons who are to take in succession as heirs-at-law or next of kin are to be ascertained as of the time of Mrs. Martling's death, and the word "heirs" is not a word of limitation, but a *designatio personarum* of those who should be her heirs at the moment of her death, and consequently Mrs. Martling took only an estate for life.

On appeal from a decree advised by Vice-Chancellor Pitney, who delivered the following opinion :

The bill is by a *cestui que trust* against the infant heirs-at-law of the surviving trustee and the children and heir apparent of the *cestui que trust*. The subject of the trust is land. The prayer is, first, that the trust may be decreed to have been surrendered and determined ; or, second, that the infant trustee may be decreed to convey the land without consideration to such person as the *cestui que trust* shall direct ; or, third, that the infant trustee be removed and a new trustee be appointed.

David Martling, son, and one of the heirs apparent of complainant, answers, admitting the allegations of the bill, and, by cross-bill, sets up a conveyance from complainant to him of a portion of the trust estate, and prays a confirmation of his title. The other adult defendants join in an answer which asserts the existence of the trust, and join in the prayer for a new trustee.

The infant defendant submits himself to the direction of the court.

The trust was created by a deed of bargain and sale, dated May 30th, 1851, given by Richard H. Paulison to Stephen Martling (husband of complainant) and Peter Acker, and to their heirs and assigns, and the survivor of them, and his heirs and assigns, as joint tenants

"In trust, nevertheless, and upon the condition and limitations following—that is to say, that the said parties of the second part, their heirs and assigns, and the survivor and his heirs and assigns shall and will suffer and permit Elizabeth (complainant), now the wife of the said Stephen Martling, of the township of Hackensack aforesaid, to have, receive and enjoy the rents, issues and profits thereof during her natural life, free from the control of her present or any future husband, and to her separate use (subject, however, to the limitations hereinafter mentioned), and in further trust to sell and convey in fee-simple the whole or any part thereof, lease, rent or mortgage the same or any part thereof, to such person or persons, for such term or terms, for such sum or sums, and on such conditions as the said Elizabeth, by writing under hand of her own free will may direct, said writing to be binding notwithstanding the coverture of the said Elizabeth; and in case of a sale and conveyance as aforesaid, to invest the net proceeds, after paying said encumbrances, upon good and sufficient security, and pay her, the said Elizabeth, the interest accruing thereon yearly and every year, or to reinvest said net proceeds in the purchase of other real estate, as the said Elizabeth, by writing as aforesaid, may direct, to be held according to the trusts herein declared; and in further trust to sell and convey, if necessary, the whole, or any part of said premises, to pay off, satisfy and discharge the encumbrances now being and existing on the same as aforesaid; and in further trust, upon the death of said Elizabeth, to convey the lands held under the trusts herein declared, or such parts thereof as may then remain, or if the same shall then have been sold, to dispose of the proceeds thereof, unto such person or persons as the said Elizabeth, by any writing in the nature of a last will, executed by her in her lifetime, may have appointed and directed, and in default of such appointment, unto her heirs-at-law, or next of kin, as may be; said writing in the nature of a last will, to be binding for the purposes of this trust, notwithstanding the coverture of the said Elizabeth at the execution thereof."

The farm was purchased with the separate estate of the complainant previously held in trust for her by her brother, Peter Acker.

Both the trustees are dead, Peter Acker dying first. Complainant, the wife of Stephen Martling, deceased, at his death,

had three children—Stephen H. Martling (oldest son and heir-at-law of Stephen Martling, the surviving trustee), Annabella Acker and David Martling, the defendants above named. These were all born before the conveyance in question. Stephen H. Martling died December, 1891, leaving the defendant Stephen V. R. Martling, an infant, his only son and heir-at-law.

Both the trustees joined with complainant in a conveyance, for a nominal consideration, of a portion of the trust lands to the daughter, Mrs. Acker, the defendant.

Stephen Martling, as surviving trustee, joined with complainant in conveying another part, for a full consideration, to her son, David Martling, the defendant.

Complainant and her husband as such, and not as trustee, conveyed another portion to David Martling, for a nominal consideration.

Complainant and her husband as such, and not as trustee, conveyed to their son, Stephen H. Martling, now deceased, for a nominal consideration, another portion of the trust estate.

There were, besides, two conveyances by complainant to her son David, which were the subject of controversy in *Martling* v. *Martling*, reported in *2 Dick. Ch. Rep. 122*, which controversy was settled by another deed from complainant to David, dated December 16th, 1891.

The defendants, Mrs. Acker and Mrs. Martling, as guardian *ad litem* of her infant son, Stephen V. R. Martling, are entirely willing that a new trustee should be appointed in place of Stephen, who is incapacitated by infancy for the discharge of an active trust involving the duty to look after and protect the rights of the heirs-at-law of the complainant, who, under the trust as claimed by the defendants, must, in default of appointment by her, take the estate at her death.

Mrs. Acker denies the right of complainant to terminate the trust and to assume unlimited control over the estate.

On the other hand, complainant and her son David, contend that at the death of the husband of complainant, the object and purpose of the trust was accomplished, and the same came to an

end, and that the power of the complainant, under the terms of the trust, was so full and complete as to give her, at her option, the right to have a fee-simple in herself, and to that end to release and extinguish the trust.

They found this claim, first, upon the construction of the deed itself, which they claim shows such to have been the actual intention of the settler; and second, they claim that the case comes within the rule in *Shelley's Case*, which is still in force in New Jersey, as to conveyances of land, and that the effect of the conveyance, by force of that rule, was to vest in Mrs. Martling, the complainant, an equitable estate in fee, and that the legal estate is held by the trustee as a naked and executed trust, with the result that the complainant has the right to ask this court to determine it by directing a conveyance by the trustee directly to the complainant, and without consideration.

The real object of the suit is to obtain a declaration and decree of this court to that effect. There is an allegation in the bill that Mrs. Martling had been unable to carry out a proposed sale of a part of the premises, on account of a doubt of her ability to make a good title by her individual conveyance.

The difficulty which at once presents itself in granting the relief first prayed for, viz., that the trust is terminated, is as to how far such a decree would be of any value in the direction of enabling complainant to make a merchantable title. Upon the face of the conveyance, the persons ultimately interested in the trust are, in the absence of testamentary disposition by complainant, " her heirs-at-law or next of kin, as may be."

Now, of course, unless it so happens that the persons who proved to be such heirs-at-law or next of kin at her death, are parties to this suit, they will not be bound by the decree of this court made herein. I think this court ought not to make such a decree, unless the case is so clear that a purchaser by contract would be decreed to accept it on a bill for specific performance. In the well-considered and important case of *Jervoise* v. *Duke of Northumberland, 1 Jac. & W. 559*, Lord Eldon declined to decree specific performance against a purchaser, where the title was held under a trust somewhat like the present, although he

entertained a strong opinion that the case was within the rule in *Shelley's Case,* and the present *cestui que trust* was tenant in tail and competent to convey.

The same difficulty meets us in granting the second prayer, viz., to direct the infant trustee to convey to the complainant without consideration.

I am unable to adopt the view that, looking at the scheme of the settlement, it was the intention of the settler to give such an absolute control of the title to the complainant as that she may dispose of it to her own use at any time during her lifetime. The limitation of the trust seems to have been prepared with care by a conveyancer of some experience, and he seems to have avoided giving such right. The mere fact that he does not give it in express terms, when it was so easy to do so, is significant; and it may well be doubted whether, if he had done so, it would not have defeated the very object of the trust.

The provision for a sale and conveyance seems to me to mean a sale and conveyance for value. Else why provide for the investment of the proceeds? I think it is the duty of the trustee of such a trust to see to it that, upon the sale of the estate, a proper price is obtained. *Mortlock* v. *Buller, 10 Ves. 292; Doran* v. *Wiltshire, 3 Swanst. 699; 2 Sugd. Pow. \*487; Lew. Trusts (Flint's ed.) \*427 § 18; Chance Pow. § 2418 et seq.*

It is contended by complainant that this settlement must be treated as one made by herself in all respects as if it had been a covenant to stand seized to uses. Grant that it must be so construed, still I find in it no express reservation of a power of revocation. The power to direct a sale for a full consideration, which shall be subject to the same trusts, does not amount to a power in the settler to revoke absolutely.

But, then, complainant relies upon the rule in *Shelley's Case.* Her argument is that complainant clearly takes an equitable estate for life, with remainder to her right heirs, and hence she has a fee. It must be admitted that the rule in question applies to equitable as well as to legal estates, unless the legal estate be vested in trustees who have some duty to perform with regard to it. Or, as expressed by Mr. Cruise (*6 Cruise Dig., tit. "Devise," \*284 et seq.; 3 Cruise Dig. (Am. ed., 1857) 356*):

"It has long been settled that in devises of mere trust estates, where no conveyance is directed to be made, the construction is the same in chancery as it would be in a court of common law upon a devise of the legal estate."

Here a conveyance is directed to be made, and the argument that it is within the case of *Papillon* v. *Voice, 2 P. Wms. 472,* and *Lord Glenorchy* v. *Bosville, temp. Talbot 3,* is not without force. I have looked at numerous cases, as well those collected in *1 Fearne Rem.* \**114 et seq.,* and *Pres. Est.* \**387 et seq.,* as those collected by Mr. Cruise, *ubi supra,* and others still later, and, without commenting upon them in detail, I find it enough to say that I am not well enough satisfied that this case is within the rule in question to act upon such a conclusion in the way I am asked to do by the complainant. I will add that, at this day, the courts are not disposed to extend the rule in question to doubtful cases, because, confessedly, the effect of its application is to produce results contrary to the intention of the donor or testator, as the case may be.

A modern case is *In re Thurston, 154 Mass. 596.*

I, therefore, decline to advise a decree directing a conveyance by the infant trustee to the complainant without consideration. I will, of course, advise a decree directing him to convey to a new trustee to be appointed, the new trustee to hold upon the same trusts as the present trustee.

*Mr. Gilbert Collins,* for the appellant David Martling.

*Mr. Cornelius Christie,* for the appellant Elizabeth Martling.

*Mr. Washington B. Williams,* for the respondents.

The opinion of the court was delivered by

DEPUE, J.

The bill in this case was filed for the construction of certain trusts created by a deed of conveyance of land. The prayer is (1) that the trust may be declared surrendered and determined; (2) that the infant trustee (the original trustees being dead) may

be decreed to convey *without* consideration to such person as Mrs. Martling may direct; and (3) that new trustees be appointed in lieu of the infant trustee.

The premises described in the trust deed were conveyed to the trustees subject to two mortgages—the one given by Henry Van Glahn and wife to Abraham Van Valen, dated December 8th, 1849, to secure the payment of $1,000, and the other given by Peter Acker to Henry Van Glahn, bearing date May 1st, 1850, to secure the payment of $1,500.

The deed is to the trustees, their heirs and assigns, and the trusts declared are:

*First.* To permit Elizabeth Martling (now living) to have, receive and enjoy the rents, issues and profits thereof during her natural life, free from the control of her present or any future husband, and to her separate use, subject, however, to the limitation hereinafter mentioned.

*Second.* To sell and convey in fee-simple the whole or any part thereof, lease, rent or mortgage the same or any part thereof to such person or persons for such term or terms, for such sum or sums, and on such conditions as the said Elizabeth by writing under her hand of her own free will may direct.

*Third.* In case of a sale and conveyance as aforesaid, to invest the net proceeds, after paying said encumbrances, upon good and sufficient security, and pay her, the said Elizabeth, the interest accruing thereon yearly and every year, or to reinvest said net proceeds in the purchase of other real estate, as the said Elizabeth by writing may direct, to be held according to the trusts in the said deed declared.

*Fourth.* In further trust to sell and convey, if necessary, the whole or any part of said premises to pay off, satisfy and discharge the encumbrances now being and existing on the same as aforesaid.

*Fifth.* In further trust upon the death of the said Elizabeth to convey the lands held under the trusts therein declared, or such parts thereof as may then remain, or if the same shall then have been sold, to dispose of the proceeds thereof unto such person or persons as the said Elizabeth by writing in the nature

of a last will, executed by her in her lifetime, may have appointed and directed, and in default of such appointment, unto her heirs-at-law or next of kin, as may be.

The lands embraced in this conveyance were purchased with the separate estate of Elizabeth Martling, and by her and her husband conveyed to Richard Paulison, her brother, who made the deed which is the subject of consideration in this case.

The deed and the facts upon which this litigation arose are fully set out in the opinion of the vice-chancellor.

The grantees named in the deed by force of the conveyance took the legal estate in the premises conveyed, subject to the trust declared. The trust upon which the conveyance was made was not a use executed by the statute of uses (*27 Hen. VIII. c. 10*), so as to transfer the legal estate to the *cestui que use*. This statute was in substance re-enacted in this state by the seventh section of the act of March 17th, 1714. *Rev. p. 165 ¶ 66; Montgomery* v. *Bruere, 1 South. \*282; Den* v. *Crawford, 3 Halst. 109, 113; Melick* v. *Pidcock, 4 Atl. Rep. 98.* The settled doctrine in the construction of this statute, as established at an early period of the common law, is that the statute executes only the first use, on the principle that a use cannot be limited upon a use. *Price* v. *Sisson, 2 Beas. 169; S. C., 2 C. E. Gr. 475; Croxall* v. *Sherered, 5 Wall. 268.* And where the conveyance is by bargain and sale, and the trustees have active duties to perform which require a legal estate, such as to sell and convey and invest the proceeds of such sale, to lease, rent or mortgage, to sell and convey, and the like, in the execution of the trust, the legal estate becomes vested in the trustees, and remains in them until the trusts are completely performed. *1 Cruise Dig. 386; Zabriskie* v. *Morris and Essex Railroad Co., 6 Stew. Eq. 22.*

There is a distinction between a use executed by the statute of uses and an executed trust. Trusts are classified as executed and executory on other considerations than those that arise under the statute of uses. An executed trust, as distinguished from an executory trust, is one in which the limitations and trusts are fully and perfectly declared; an executory trust is where the

limitations are imperfectly declared and the intent of the grantor is expressed in general terms. In an executed trust the duty of the trustee is to carry into effect the trust as declared; in an executory trust the manner in which the intent of the grantor is to be carried into effect is left substantially in the discretion of the trustee. The trusts set out in the deed are fully and perfectly declared, and in the sense here defined are executed trusts, and, the legal estate being in the trustees, an equitable estate became vested in Mrs. Martling. *Cushing* v. *Blake, 3 Stew. Eq. 689.*

The contention on the part of the appellants is that the trusts having been completely executed, and the estate of the trustees thereby terminated, Mrs. Martling was entitled to have the legal estate conveyed to her. The ultimate destination of the trust estate or its proceeds, as directed by the limitations contained in the deed, is to Mrs. Martling's heirs-at-law or next of kin. The trust, therefore, has not determined, and is a continuing trust until completely executed by the transfer of the estate to those who shall be ultimately entitled.

It is also clear that the power to sell and convey as she may direct, construed in connection with the succeeding words directing the trustees to invest &c., and pay interest &c., or reinvest in the purchase of other real estate, to be held according to the original trusts, imports a sale for a consideration—a *bona fide* price. The opinion of the vice-chancellor on this head is entirely satisfactory.

The other contention on the part of the appellants is that, under this deed, Mrs. Martling took a fee under the rule in *Shelley's Case.* This contention presents the real question in this case. In equity, equitable estates are construed as legal estates and are subject to the same incidents, properties and consequences as under like circumstances belong to similar estates at law; and in giving effect to the limitations of trusts, courts of equity adopt the rules of law applicable to legal estates. Among these rules is the rule in *Shelley's Case,* and a limitation which in legal estates would create a fee, under the rule just mentioned, will have a like effect with respect to an equitable estate. *Cushing* v. *Blake, supra.*

The rule of law, laid down in *Shelley's Case*, is that where the ancestor takes an estate of freehold with a remainder, either mediate or immediate, to his heirs, or the heirs of his body, the word "heirs" is a word of limitation of the estate and not of purchase—that is, that upon such a remainder the estate vests in the ancestor himself, and the heir, when he takes, shall take by descent from him, and not as a purchaser. Under *Shelley's Case*, where a prior estate of freehold is given to the ancestor, and a subsequent limitation contained in the same instrument is expressed to be to his heirs, whether general or special, the general rule is that no estate is taken by the heirs, but an estate of inheritance, corresponding in *quantum* to the class of heirs specified, is taken by the testator. *Chall. Real Prop. 124.* In other words, under the rule in *Shelley's Case*, where lands are given to A. for life, with a limitation over of an estate which in terms is expressed to be given to his heirs, the estate of the ancestor, though expressly given for life, is by force of this rule enlarged to a fee, the remainder over being executed immediately in the ancestor.

The rule in *Shelley's Case* is a rule of positive law, and not of construction. Where, upon the construction of a grant or devise, the rule is found to be applicable, it cannot be controlled by any expression of a contrary intent. In such cases the devolution of the estate is irresistibly fixed. But whenever the word "heirs" is used in a conveyance or devise, and the rule in *Shelley's Case* is invoked, a preliminary question arises, whether the word "heirs" has been used in such a sense as will make the rule in *Shelley's Case* applicable. The scope of this inquiry and the manner in which it is to be conducted will appear in the authorities hereinafter cited.

Mr. Hargrave, in his discussion of the rule in *Shelley's Case*, uses this language :

"The rule in *Shelley's Case* can no longer be treated as a *medium*, either for finding out intention, or for assisting to execute it. On the contrary, the rule supposes the intention already discovered, and to be, that the gift or conveyance in question has first given to some person an estate of freehold, and then superadded a succession to the heirs general or special of that same person, by

Martling *v.* Martling.

making him or her the ancestor, *terminus* or *stirps*, by reference to which the whole generation and posterity of heirs is to be accounted. Whether the conveyance has or has not so constituted an estate of freehold with a succession engrafted upon it, is a *previous* question, which ought to be adjusted before the rule is thought of To resolve that point is not the office of the rule in *Shelley's Case*, nor from its nature can it contribute any assistance whatever. * * * What the donor or testator means by *heir* or *heirs*, or *heirs-male of the body*, or *issue*, should be first adjusted without the least reference to or thought of the rule. Till that meaning shall be settled, it is uncertain, whether the rule in *Shelley's Case* may not be quite a foreign consideration. When, indeed, it is once settled that the donor or testator has used words of inheritance according to their legal import; has applied them intentionally to comprise the whole line of heirs to the tenant for life; has really made him the *terminus* or ancestor, by reference to whom the succession is to be regulated; then, too, it will appear that, being considered according to those views of policy from which it originated, it is perfectly immaterial whether the testator meant to avoid the rule or not, and that to apply it and to declare the words of inheritance to be words of *limitation*, to be words vesting an inheritance in the tenant for life, and to be words vesting a remainder in fee or in tail in him as the ancestor and *terminus* to the heirs, is a mere matter of course. * * * On the other hand, if it shall be decided that the testator or donor did not mean, by the words of inheritance after the estate for life, to use such words in their full and proper sense; did not mean to involve the whole line of heirs to the tenant for life, and to include the whole of his inheritable blood; did not mean to engraft a succession on his preceding estate, and to make him the ancestor of *terminus* for the heirs; but, instead of this, intended to use the word *heirs* in a limited, restrictive and untechnical sense; intended to point at such individual person, as should be the heir, or heir of the body, of the tenant for life at the moment of his decease; intended to give a distinct estate of freehold to such single heir, and to make his or her estate of freehold the groundwork for a succession of heirs to constitute him or her the ancestor *terminus* and stock for the succession to take its course from. In every one of these cases, the premises are wanting upon which only the rule in *Shelley's Case* interposes its authority; it is clearly a case in which the remainder to the heirs of the tenant for life having the premises belonging to a *purchase*, cannot enure by *limitation* or *descent;* and thus the rule in *Shelley's Case* becomes quite extraneous matter." *Harg. Law Tr. 574, 576.*

Mr. Butler, in his note (*2 Co. Litt. 376 b*), discusses this subject at length. His comment is based largely on the opinion of Mr. Justice Blackstone, in *Perrin* v. *Blake*, and the line of reasoning he pursues and the conclusion he adopts are the same as those stated by Mr. Hargrave in the extract above quoted.

Equally explicit is the language of Mr. Hayes. He says:

Martling *v.* Martling.

"The question whether the word 'heirs' is used as a word of limitation is to be solved by the ordinary rules of interpretation, without reference to the rule of *Shelley's Case*, to which it would be highly impertinent to advert until this question is disposed of. Nor can the application of the rule ever be a matter of doubt when the intention to create the above species of limitation is once fixed." *Hayes Est. § 7 XIII.*

The great authority of Mr. Fearne must not be overlooked. He says:

"Nothing can be better founded than Mr. Hargrave's doctrine, that the rule in *Shelley's Case* is no medium for finding out the intention of the testator; that on the contrary, the rule supposes the intention already discovered * * * which ought to be adjusted before the rule is thought of—that to resolve that point, the ordinary rules for interpreting the language of wills ought to be resorted to; that when it is once settled that the donor or testator has used words of inheritance, according to their legal import, has applied them intentionally to comprise the whole line of heirs to the tenant for life, and has really made him the *terminus* or ancestor, by reference to whom the succession is to be regulated, then comes the proper time to inspect the rule in *Shelley's Case*; that then, too, it will appear that * * * it is perfectly immaterial whether the testator meant to avoid the rule or not; and that to apply it, and declare the words of inheritance to be words of limitation vesting an inheritance in the tenant for life, as the ancestor and *terminus* of the heirs, is a mere matter of course." *Fearne Cont. Rem. 188.*

The ruling cases in the English courts are *Perrin* v. *Blake, Harg. Law Tr. 490; Jesson* v. *Wright, 2 Bligh 1; Roddy* v. *Fitzgerald, 6 H. L. Cas. 823.*

In *Perrin* v. *Blake*, Mr. Justice Blackstone divides the rules for ascertaining the intention of a devise into three classes, the first of which consists of rules that are of an essential, permanent and substantial kind, considered as the indelible landmarks of property, irrevocably established by the well-weighted policy of the law, and which cannot be shaken or disturbed by any whim or caprice of a testator, however fully or emphatically expressed. The other two classes of rules are rules of interpretation or evidence to ascertain the intention of parties, by annexing particular ideas of property to particular modes of expression. These rules, he declares, are of a more flexible nature than those of the preceding kind, and admit of many exceptions. "For, if the intention of the testator be clearly and

manifestly contrary to the legal import of the words which he has thus hastily and inadvisedly made use of, the technical rule of law shall give way to this plain intention of the testator. * * * But then this intention of the testator, which is to ride over and control the legal operation of his own words, must be manifest and certain and not obscure." Among the latter class of rules he placed the rule in *Shelley's Case.*

The same views are expressed by Lord Eldon and Lord Redesdale in *Jesson* v. *Wright,* as will appear by their opinions in the report of the case (at *pp. 53, 56*). The same remark will apply to the opinion of the judges in *Roddy* v. *Fitzgerald.* In the course of his opinion in that case, Lord Cranworth said: "Where the testator shows upon the face of his will that he must have used technical words in other than their technical sense, there is no rule that prevents us from saying that he may be his own interpreter." The subject is discussed in the same light in *Bowen* v. *Lewis, 9 App. Cas. 890.*

In *Doe* v. *Gallini, 5 B. & Ad. 621,* Lord Denman states the doctrine in these words: "The more correct mode of stating the rule of construction is that technical words or words of known legal import must have their legal effect, even though the testator uses inconsistent words, unless those inconsistent words are of such a nature as to make it perfectly clear that the testator did not mean to use the technical words in their proper sense." In a later case, Chief-Justice Cockburn, in speaking of the rule in *Shelley's Case,* and the conditions under which it should be applied, uses this vigorous language: "When once the donor has used the term ' heirs,' or ' heirs of the body,' as following on an estate of freehold, no inference of intention, however irresistible, no declaration of it, however explicit, will have the slightest effect. The fatal words once used, the law fastens upon them and attaches to them its own meaning and effects as to the estate created by them, and rejects, as inconsistent with the main purpose which it inexorably and despotically fixes on the donor, all the provisions of the will which would be incompatible with an estate of inheritance, and which tend to show that no such estate was intended to be created; although all the while it may be

50

clear as the sun at noonday that by such a construction the in-
tention of the testator is violated in every particular." But he
adds : "Although the rule thus established is inflexible to the
extent here stated, there is, nevertheless, one quarter from which
it permits light to be let in and effect to be given to the real
intention of the testator. This is where, by some explanatory
context, having a direct and immediate bearing upon the term
'heirs,' or 'heirs of the body,' the devisor has clearly intended
that he has not used these words in their technical, but in their
popular sense, namely, that of sons, daughters or children, as
the case may be." *Jordan* v. *Adams, 9 C. B. (N. S.) 483, 499.*

This doctrine was recognized by Chief-Justice Whelpley, in
*Kennedy* v. *Kennedy, 5 Dutch. 185, 187,* in these words : "The
rule in *Shelley's Case* was adopted, as a rule of interpretation, to
give effect to the paramount intent of the testator. The words
'heirs of the body,' or 'heirs,' will yield to a particular intent,
that the estate shall be only for life, and that may be from the
effect of the superadded words, or any expressions showing the
particular intent of the testator, but that must be clearly intelli-
gible and unequivocal."

The rule in *Shelley's Case* is a technical rule, and the word
"heirs" is a technical expression interpreted according to the
canons of descent. The word "heirs" undoubtedly indicates
succession to the estate of the ancestor by those who may be his
descendants, but it may be a succession by descent, creating either
an estate in fee or in tail in the ancestor, or the selection of those
persons who, by the canons of descent, would be heirs, as a mere
*designatio personarum* of the objects of the grantor's or testa-
tor's bounty, in which event the heir or heirs take by purchase.
Whether the word "heirs" is used in its technical sense, or in
the limited, restrictive and untechnical sense, intending to point
at such individual person as should be heir, or heir of the body
of the tenant for life, at the moment of his decease, is a matter
of construction. *Harg. Law Tr. 576.* The solution of the
problem whether the word "heirs" is used in the one or the
other sense, is determined by a construction of the terms of the
grant or devise, to ascertain whether the word "heirs" is used

in the one sense or the other—in its technical sense, or as a mode of indicating persons; for, as was said by Mr. Hargrave:

"To insist that men shall only use words in one certain sense would be a monstrous tyranny; and there is such an infinite variety in the language and circumstances which may occur to distinguish one case from another, that to lay down one general rule of interpretation so absolute as to be indispensable, would be making legal interpretation to torture like the bed of the fabulous Attic robber, 'Procrustes,' and so every instrument would be cruelly stretched or curtailed into the same meaning." *Harg. Law Tr.* 575.

In *Perrin* v. *Blake*, Mr. Justice Blackstone said: "The true question of intent [in the construction of an instrument] will turn, not upon the quantity of estate intended to be given to the ancestor, but upon the nature of the estate intended to be given to the heirs of the body; that the ancestor was intended to take an estate for life is certain; that his heirs were intended to take after him is equally certain; but how those heirs were intended to take, whether as descendants or as purchasers, is the question. If the testator intended they should take as purchasers, then the ancestor remained only as tenant for life; if he meant they should take only by descent, or had formed no intention about the matter, then by operation and consequence of law the inheritance first vested in the ancestor."

The discussion of this subject has been mainly in the construction of devises, but the doctrine is equally applicable to deeds of conveyance to uses. *Sir Molye Finche's Case, 6 Coke 64, 65; Carter* v. *Ringstead, Cro. Eliz. 208; 4 Cruise 275, 281; Evans* v. *Evans, 2 Ch. 173 (1892).* In the extract from Mr. Hargrave's comment, that learned lawyer applies the same rules of construction and interpretation to conveyances to uses as to devises. The cases are collected in *10 Eng. Rul. Cas. 714, 758*, note to *Jesson* v. *Wright*, and in an elaborate note in *22 Am. & Eng. Encycl. L. 493, 524, tit. "Shelley's Case."*

In applying these rules of construction it is fully settled that the fact that the estate of the ancestor is expressly for life only and no longer, or that he shall not sell or dispose of the estate for any longer time than his life, and like expressions, applied to the estate of the tenant for life, will not prevent the application

of the rule in *Shelley's Case.* In *Lippincott* v. *Davis, 30 Vr. 241,* this court held that the rule in *Shelley's Case* applied to a devise of lands to J. G. " during his natural life, and afterwards *to descend unencumbered* to his lawful heirs"—the words in italics being equivalent to the words " none of my children " (to whom a life estate was given) " should sell and dispose of my estate for longer time than his life," which were held in *Perrin* v. *Blake* not to operate to exclude the rule in *Shelley's Case.* But it is equally well settled that the construction to determine the meaning of the testator or donor in using the word " heirs " shall be from the entire language of the instrument. In *Jordan* v. *Adams, 6 C. B. (N. S.) 748, 761,* the case under consideration, presented the construction of a devise to W. J. for life, and after his decease to the heirs male of his body in such parts as W. J., their father, should, by deed or will, appoint or direct. Chief-Justice Erle, in delivering the opinion of the court, said that the words " heirs male of his body " created an estate tail, " unless the judicial mind sees with reasonable certainty from other parts of the will the testator's intention that these words should not operate as words of limitation of the inheritance, but should be words of purchase, creating an estate in remainder in the persons coming within the designation of the words 'heirs male of the body,' and also within the further description contained in the will." He added: " We proceed, therefore, to examine the other parts of the will, for the purpose of ascertaining the intention, and for this purpose all the parts of the will should be considered together and effect given to every part unless there should be absolute inconsistency. * * * The devise to William is for life, and although this is of no avail where the rule in *Shelley's Case* applies, still until it is ascertained that the testator intended by the word 'heirs' to pass the inheritance, that rule has no application. Here that intention is the point in dispute, and in weighing both sides, the expression of intention to devise to W. J. for life operates against inferring an intention to give an estate tail." Nor will an unexecuted power, which if executed would divert the estate from the channel of succession indicated by the words of the grant or devise, of itself supersede the rule in *Shelley's*

*Case;* for such a power abstractly considered may or may not indicate the intention of a grantor or devisor to use the word "heirs" or "heirs of the body" in a technical sense. The terms in which such a power is expressed, and the purpose for which the grantor or devisor intended that it should be exercised, are not, however, to be rejected.

The power of sale conferred upon the trustees by Mrs. Martling's directions was to be a sale, the net proceeds of which the trustees were required to invest upon good and sufficient security, paying her the interest thereon yearly and every year, or to reinvest in real estate, as she might direct; but the proceeds of such a sale, however invested, remained part of the trust estate, to be held upon the trusts declared in the deed. The power to sell and convey is not a power vested in Mrs. Martling during her lifetime to divert the estate from the persons who, in default of her disposition by will, would be entitled to it. The proceeds of the sale of the trust estate invested on security, as well as the lands in which such proceeds might be reinvested, are to be held for the benefit of the heirs-at-law or next of kin in compliance with the terms of the trusts. *Doe* v. *Martin, 4 T. R. 39, 66.* The power is, in substance, a power in her by this method to appoint the estate between her heirs and next of kin. A construction which would give to the word "heirs" its strict technical meaning, and vest in Mrs. Martling an estate in fee, would entirely defeat the purpose for which this power was conferred. The estate given to Mrs. Martling is expressly made subject to the limitations thereinafter contained in the deed. The only limitation in the deed to which Mrs. Martling's estate can be said to be subject is that if she procures a sale and conveyance of the trust estate, the proceeds thereof shall remain in trust for the benefit of her heirs-at-law or next of kin in default of her appointment by will, as she may direct the investment to be made. Who shall answer the description of next of kin of Mrs. Martling can be ascertained only at her death, and whether the trust estate or its proceeds shall go to her next of kin or heirs-at-law and in what shares or proportions, will depend on the condition of the trust estate at her death. In the face of

these contingencies the words "heirs-at-law" cannot, on any reasonable grounds, receive a construction different from the words "next of kin," with respect to the point of time when the class of beneficiaries is to be ascertained. Suppose a sale of part of the premises by the trustees under the power referred to and the proceeds invested simply on good security, would the proceeds so invested go to the next of kin and the remaining lands be vested in Mrs. Martling in fee? Such a distribution of the trust estate could only be accomplished by mutilation of the trust.

Furthermore, the conveyance and the trusts declared were made by a deed; and no rule of law is more firmly established than that in deeds conveying to uses the word "heirs" is necessary to pass a fee, and no synonym can supply the omission of the word "heirs." *Melick* v. *Pidcock, 4 Atl. Rep. 98.* In a deed the word "issue" is universally a word of purchase. *Price* v. *Sisson, 2 Beas. 168; S. C., 2 C. E. Gr. 476; Doe* v. *Collis, 4 T. R. 299.* The words used indicating succession to the estate after the death of Mrs. Martling, and on her failure to devise it, are "heirs-at-law or next of kin, as may be." A deed of conveyance to A., *habendum* to his heirs or next of kin, as a legal conveyance would be an anomaly and could only create an estate for life in A. The illustration is apt. The operation of the rule in *Shelley's Case,* when, in fact, it applies, eliminates all estates and powers intervening between the ancestor's estate for life and the limitation over. A grant to A. for life, followed by estates less than freehold or unexecuted powers, in default &c. to his heirs, is, as a legal proposition, read as a grant to A. and his heirs—in this case it would be to A. "and his heirs-at-law or next of kin, as may be"—a rendering that demonstrates that the rule in *Shelley's Case* cannot, on any principle of construction, be applied to this deed.

Independently of the technical consideration just mentioned, and construing this trust from all the limitations and provisions contained in it, it is clear that the terms "heirs-at-law" and "next of kin," in providing for the ultimate destination of the estate, although the disjunctive "or" intervenes, should receive

the same construction as to the point of time when these two classes of beneficiaries respectively are to be ascertained, and that the words " heirs-at-law," as well as " next of kin," should be construed to mean persons who either as heirs-at-law or next of kin come into existence at Mrs. Martling's death. But, it is said that, inasmuch as the power of converting the estate into money has not yet been executed, the words "next of kin " should be rejected, and by force of the words "heirs-at-law " Mrs. Martling be given a fee in the premises. No case justifying the rejection of words for the purpose of bringing the rule in *Shelley's Case* in force has come under my observation. In *Jordan* v. *Adams* it was conceded that the words " heirs of his body " would create a fee tail. The court decided that the subsequent language, providing for a division among heirs of the body by the appointment of *their* father, reduced the words " heirs of his body " to sons and children, and therefore gave only an estate for life. An argument was unsuccessfully made that the words " heirs of his body " were of themselves sufficient to create a fee tail, and that inasmuch as· the appointment might be made by the father, who was then living, by deed or will, the clause providing for the division among the heirs-at-law was either unimportant or should be rejected.

On the construction of the entire trusts contained in this deed we think that the persons who are to take in succession as heirs-at-law are to be ascertained as of the time of Mrs. Martling's death, and that, therefore, those words are not words of limitation within the rule in *Shelley's Case,* but a *designatio personarum* of those who shall be her heirs at the moment of her decease, and that consequently Mrs. Martling took only an estate for life. The decree of the court of chancery was that the trusts expressed in said deed still existed, and that the lands and real estate held under the trust descended and became vested in Stephen Van Rensselaer Martling, an infant under twenty-one years, as heir at common law of the last surviving trustee, and that the said infant trustee should be removed and a new trustee appointed in his place.

The decree should be affirmed.

*For affirmance*—THE CHIEF-JUSTICE, DEPUE, GARRISON, GUMMERE, LUDLOW, MAGIE, VAN SYCKEL, BARKALOW, BOGERT, KRUEGER—10.

*For reversal*—None.

NOTE.—In a recent case in the house of lords the origin and application of the rule in *Shelley's Case* were discussed at length.   *Van Grutten* v. *Foxwell, L. R., App. Cas. 658 (1897).*—REP.